UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ATLANTIC RECORDING CORPORATION; BMG MUSIC; CAPITOL RECORDS, INC.; ELEKTRA ENTERTAINMENT GROUP INC.; INTERSCOPE RECORDS; MOTOWN RECORD COMPANY, L.P.; SONY BMG MUSIC ENTERTAINMENT; UMG RECORDINGS, INC.; VIRGIN RECORDS AMERICA, INC.; and WARNER BROS. RECORDS INC., | ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| XM SATELLITE RADIO INC., | ) ) ) |
| Defendant. | ) ) |

Civil Action No.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES**

ECF CASE

Plaintiffs aver as follows:

## INTRODUCTION

1.     Plaintiffs — record companies that produce, manufacture, distribute, sell, and license the vast majority of copyrighted sound recordings in this country — bring this case to halt Defendant XM Satellite Radio Inc.'s ("XM" or "Defendant") massive wholesale infringement of Plaintiffs' copyrighted sound recordings.  XM currently operates a subscription satellite radio service pursuant to a license agreement that is expressly limited to the scope of the compulsory statutory license granted by Congress in 17 U.S.C. § 114.  That license gives XM one limited right:  to publicly perform Plaintiffs' copyrighted works in a non-interactive radio-like service.  It does *not* give XM the right to distribute or reproduce Plaintiffs' copyrighted works.

1

2.     XM, however, has launched a new digital download subscription service that obliterates the careful limits Congress imposed in Section 114 and throughout the U. S. Copyright Act (the "Copyright Act").  This new service distributes perfect digital *copies* of Plaintiffs' sound recordings to XM subscribers and allows subscribers to store those copies for unlimited replay for as long as they maintain their XM subscription.  XM refers to its new tethered download service as "XM + MP3," a reference to its combination of XM radio broadcasts with the ability to receive and store permanent digital downloads.  The XM + MP3 service thus goes far beyond the  traditional radio broadcast licensed in § 114, and effectively provides a digital download service as well. Indeed, far from the "radio-like" service for which XM enjoys a statutory license, XM promises its subscribers that this new service "delivers new music to you everyday and lets you choose tracks to create your own custom playlists," thereby providing the "Ultimate Music Experience."  *See* XM Consumer Electronics Show 2006 Product Guide.

3.     XM's new service encroaches directly and obviously on the digital download business, undermining Plaintiffs' ability to distribute their copyrighted works through lawful legitimate services, such as iTunes and others that distribute Plaintiffs' sound recordings under the authority of Plaintiffs.  Because subscribers will receive and be able to store individual songs with the XM + MP3 service, and because XM makes available vast catalogues of music in every genre, XM subscribers will have little need ever again to buy legitimate copies of Plaintiffs' sound recordings.  XM explicitly advertises this substitution effect by touting its service's advantages over the iPod, one of many digital download systems:  "It's not a Pod, it's the Mothership."  *See* XM

Consumer Electronics Show 2006 Product Guide.  XM deliberately exploits this substitution effect to draw new subscribers to its service and to encourage subscribers to maintain their subscriptions.  XM is not licensed by Plaintiffs — and pays Plaintiffs nothing — for this unauthorized distribution of Plaintiffs' copyrighted sound recordings. XM's conduct thus amounts to infringement of Plaintiffs' exclusive right under the Copyright Act to control the distribution and reproduction of their recordings.  Plaintiffs are entitled to permanent injunctive relief to halt XM's brazen expropriation of Plaintiffs' rights under the Copyright Act and the common law of the State of New York.  Plaintiffs are further entitled to damages from XM for its violation of these and other of Plaintiffs' rights, as detailed below.

## NATURE OF THE ACTION

4.      Under Section 106 of the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*, Plaintiffs have the distinct, severable and exclusive rights to, among other things, reproduce and distribute their copyrighted works to the public.  17 U.S.C. §§ 106(1), (3). Pursuant to a 1995 amendment to the Copyright Act, Plaintiffs also have the distinct, severable and exclusive right to perform publicly their copyrighted works by means of a digital audio transmission. *Id.* § 106(6); *see also* Digital Performance in Sound Recordings Act of 1995, Pub. L. No. 104-39, 109 Stat. 336 (adding Section 106(6)).

5.      Under Section 114 of the Copyright Act, Defendant XM is eligible for a narrowly limited statutory license in Plaintiffs' copyrighted sound recordings to do one thing and one thing only:  to perform publicly those sound recordings in a radio-like, non-interactive service, via satellite radio.  For public performances within the Section 114 statutory license, XM is not required to seek individual licenses or permission to use

Plaintiffs' copyrighted works. It merely must pay Plaintiffs a statutorily prescribed royalty rate. Section 114 imposes a number of conditions to ensure that Defendant's service remains radio-like in character and does not exploit Plaintiffs' recordings in any manner beyond pure performance.

6.    Contrary to that limited license, Defendant has developed the new XM + MP3 subscription service which, in addition to publicly performing Plaintiffs' copyrighted works, also *distributes* copies of Plaintiffs' copyrighted sound recordings — without any authority — and allows XM subscribers to create permanent libraries of those recordings as long as subscribers maintain their XM subscriptions. The service transforms XM's satellite transmission from a radio broadcast into a digital download delivery service that provides subscribers with permanent copies of individual songs. A subscriber can collect these copies from XM's live broadcasts, and the service will alert the subscriber whenever his or her favorite songs and artists are playing on any of XM's 67 music channels so that the subscriber can be sure not to miss the opportunity to store his or her favorite songs for unlimited replay. More egregiously, the new service allows subscribers to save individual downloaded files directly from digital playlists provided by XM — *without ever having to listen to XM's actual satellite radio programming*. Subscribers can then mix and arrange their own personal playlists just as they can with any other digital download service such as Napster or Apple's iTunes.

7.    The sound recordings owned by Plaintiffs and unlawfully distributed by Defendant include some of the most commercially successful recordings in the world. Defendant is thus seeking to capitalize upon the popularity of Plaintiffs' sound recordings in order to attract and retain the maximum number of XM subscribers. In other words,

Defendant purposefully seeks to gain a financial benefit based on massive and willful copyright infringement.

8.      Defendant's conduct is causing, and will continue to cause, Plaintiffs grave and irreparable harm.  Plaintiffs thus seek a declaration that Defendant's new subscription service willfully infringes Plaintiffs' copyrights both directly and secondarily, and constitutes unfair competition under New York law.  Plaintiffs further seek a permanent injunction under both federal and state law prohibiting XM from further infringement of Plaintiffs' copyrights.  Plaintiffs pray also for statutory or actual damages for willful copyright infringement in the maximum amounts allowed under Section 504 of the Copyright Act, as well as compensatory and punitive damages for Defendant's violations of New York state law.

### JURISDICTION AND VENUE

9.      This is a civil action seeking injunctive relief and damages for copyright infringement under the Copyright Act, 17 U.S.C. § 101 *et seq.*, and for unfair competition and common-law copyright infringement under New York law with respect to Plaintiffs' sound recordings fixed prior to February 15, 1972.

10.      This Court has original subject matter jurisdiction over the Copyright Act claims pursuant to 28 U.S.C. §§ 1331 and 1338(a), and the state law claims pursuant to 28 U.S.C. §§ 1338(b) and 1367(a).

11.      This Court has personal jurisdiction over Defendant because Defendant resides and may be found in New York, and does systematic and continuous business in New York and in this District.

12.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(c) and 1400(a), in that Defendant resides in this District.

**PLAINTIFFS AND PLAINTIFFS' BUSINESS**

13.    Plaintiffs are among the most well-known and respected record companies in the United States and the world.  They are in the business of producing, manufacturing, distributing, selling, and licensing the distribution and sale of sound recordings, or arranging to do so, in the United States.

14.    The reputations of Plaintiffs as producers of sound recordings containing high artistic and technical quality are favorably known in the State of New York, and throughout the United States and the world.

15.    Plaintiffs are the copyright owners or owners of exclusive rights under copyright with respect to the vast majority of copyrighted sound recordings sold in the United States.  Each Plaintiff has applied for and/or received Certificates of Copyright Registration from the Register of Copyrights for its copyrighted sound recordings.  Each Plaintiff has the exclusive rights, among other things, to "reproduce the copyrighted work," to "distribute copies or phonorecords of the copyrighted work to the public," to perform publicly the copyrighted work by means of digital transmission, and to authorize or license any such activities.  17 U.S.C. §§ 106(1), (3), (6).

16.    Additionally, Plaintiffs have entered into various agreements by which they obtained the common-law copyright rights in sound recordings embodying certain musical performances which were initially "fixed" prior to February 15, 1972 (the "Pre-1972 Recordings"), and therefore are subject to protection under state law.  17 U.S.C. § 301(c).  Pursuant to these agreements and New York state common law,

Plaintiffs possess, *inter alia*, the exclusive right to manufacture, distribute, and sell these recordings.

17.    In addition to manufacturing, distributing, selling, and licensing phonorecords in the form of CDs, cassettes and other tangible media, Plaintiffs also sell, distribute and license phonorecords in the form of digital audio files, which are marketed and sold online, and delivered to the consumer instantly via the Internet and otherwise. Legitimate avenues for the digital distribution of music exist through authorized services, such as Apple's iTunes, Napster, Rhapsody, AOL Music, MP3.com, and many others that currently exist or are still emerging. These legitimate outlets of digitally distributed music are operated by or under the authority of Plaintiffs.

18.    Plaintiffs have invested and continue to invest substantial sums of money, as well as time, effort, and creative talent, to discover and develop recording artists, and to create, manufacture, advertise, promote, sell, and license sound recordings embodying the performances of their exclusive recording artists. Plaintiffs, their recording artists, and others in the music industry are compensated for their creative efforts and monetary investments largely from the sale and distribution of their sound recordings to the public, and from other exploitation of such sound recordings, including authorized online sale and distribution by others and licensed public performances by means of digital audio transmissions.

19.    A non-exhaustive exemplary list of Plaintiffs' federally copyrighted sound recordings that Defendant reproduced and distributed to XM + MP3 subscribers without authorization is attached hereto as Exhibit A. Each Plaintiff has received Certificates of

Copyright Registration from the Register of Copyrights for these copyrighted sound recordings.

20.    A non-exhaustive exemplary list of Pre-1972 Recordings in which Plaintiffs hold exclusive rights under New York law and which Defendant has unlawfully distributed to XM + MP3 subscribers without authorization is attached hereto as Exhibit B.

## DEFENDANT AND ITS SATELLITE RADIO BROADCASTS

21.    XM is the leading provider of satellite radio in the United States.  It currently broadcasts over 160 channels of programming to over 6 million subscribers nationwide for an average monthly subscription fee of $12.95.

22.    Of the 160 channels of programming, 67 are 24-hour-a-day commercial-free music channels covering nearly every genre, from heavy-metal and hip-hop to country, dance, jazz, Latin, classical and more.  Most of XM's 24-hour commercial-free music channels are highly specialized and play only a very specific genre of music.  They include, but are not limited to, 9 "Pop and Hits" channels, such as "Top 20 on 20" (Top 20 Hits), and "The Blend" (Adult Contemporary Hits); 6 "Decades" channels, such as "The '60s (Sixties Hits)" and "The '90s (Nineties Hits)"; 13 "Rock" channels, such as "Squizz (New Hard Rock)" and "Deep Tracks (Deep Classic Rock)"; 7 "Country" channels, such as "America (Classic Country)" and "Highway 16 (New Country Hits)"; 7 "Hip Hop/Urban" channels, such as "Suite 62 (Adult R&B Hits)," and "Soul Street (Classic Soul)"; 5 "Jazz & Blues" channels, such as "Bluesville (Blues)" and "Watercolors (Smooth Jazz)"; 3 "Classical" channels, such as "XM Classics (Traditional

Classical)" and "Vox (Opera/Classical Vocals)"; and 4 "Latin" channels, including "Alegria (Reggaeton/Latin Hits)" and "Aguila (Regional Mexican)."

23.     Pursuant to Section 114 of the Copyright Act, Defendant is eligible for a limited statutory license to perform publicly Plaintiffs' federally copyrighted sound recordings (*i.e.*, to play them over the satellite radio).  Specifically, the Section 114 license is expressly a limitation on the digital performance right of Section 106(6).  *See* 17 U.S.C. § 114(d) ("[n]otwithstanding the provisions of section 106(6) . . .").  Section 114 further provides that only "[t]he *performance* of a sound recording publicly . . . by means of a preexisting satellite digital audio radio service [*i.e.*, XM] shall be subject to statutory licensing."  17 U.S.C. § 114(d)(2) (emphasis added).  The statute makes clear that this limited performance license does not include the right to reproduce or distribute the sound recording.  *Id.* § 114(d)(4)(C) ("Nothing in [Section 114] shall be construed to annul, limit, impair, or otherwise affect in any way the ability of the owner of a copyright in a sound recording to exercise the rights under Sections 106(1) [reproduction], . . . and 106(3) [distribution], or to obtain the remedies available under this title pursuant to such rights.").

24.     Notably, the Section 114 performance license is limited so as to ensure that licensees' services will provide listeners with what traditional broadcast radio provides, albeit with digital sound quality.  For example, Section 114 licensees cannot publish their music programming schedules in advance of broadcast, 17 U.S.C. § 114(d)(2)(B)(ii), and their broadcasts cannot exceed the "sound recording complement," *id.* § 114(d)(2)(B)(i), which limits the number of sound recordings from the same artist or album that can be played in any three hour period, *id.* § 114(j)(13).

25.    Defendant's subscriber base has increased at a dramatic rate, due in large part to Defendant's broadcast of Plaintiffs' sound recordings.  On September 30, 2003, XM had 929,648 subscribers.  On December 27, 2004, XM had 3.1 million subscribers. One year later, XM had approximately 5.9 million subscribers, and XM projects that its subscriber base will exceed 9 million by the end of 2006.

26.    All of XM's broadcasts are encrypted to ensure that they are received only by XM subscribers using XM-sanctioned radio receivers that can decrypt XM's proprietary encryption protocol.  XM must affirmatively activate each individual radio (which, via a unique serial number, is identified with the particular subscriber) and can deactivate any radio at any time.  Subscribers pay a monthly subscription fee for the right to receive XM programming, precisely as transmitted by XM, over an XM-sanctioned receiver.  It thus is a closed and proprietary system:  XM retains complete and continuing end-to-end control over who is permitted to receive its signals, the content its subscribers receive, what subscribers can do with the content XM transmits to them, and whether and how long subscribers are allowed to keep their downloaded song files.

27.    Defendant's primary source of revenue is its listeners' subscription fees. However, Defendant also earns revenue from, among other things, subscription activation fees and advertising.

## DEFENDANT'S INFRINGING XM + MP3 SERVICE

28.    In April 2006, Defendant commercially launched a new subscription service called "XM + MP3," which it has described as the "Ultimate Music Experience." Unlike the regular XM satellite radio service, the XM + MP3 service transmits to the subscriber permanent, non-transformative, disaggregated copies of individual songs and

enables the creation of permanent libraries of those individually disaggregated and indexed sound recordings. With the XM + MP3 service, the subscribers have the option of never even listening to XM's transmissions as unified radio broadcasts but, rather, using the service solely as a digital download delivery service to receive and library individual disaggregated tracks.

29.    Defendant delivers its XM + MP3 service by means of a portable device called the "inno." The inno is approximately the size of an iPod (or small cell phone), and provides subscribers with all the capabilities of the XM + MP3 service. The device has a receiver that allows it to receive XM's live satellite transmissions from any location.

30.    Defendant has announced that it will soon release two additional XM receiver/recorders that can be used to receive the XM + MP3 service: the "Helix" and the "neXus." Upon information and belief, the Helix will have all of the same reception, permanent storage, and song manipulation capabilities as the inno. The neXus must be connected to a docking station in order to receive XM's live transmissions, but will have the same recording and storage capabilities as the other two radios.

31.    The XM + MP3 service allows subscribers to create permanent libraries of 50 hours or approximately 1000 songs, sorted by artist, title, or genre. Should the subscriber so choose, these stored files can be "locked" so that they are never recorded over or erased unless the subscriber manually deletes them or cancels his or her XM + MP3 subscription. And this 1000-song storage capacity is sure to increase substantially over time: 1000 songs today may be 10,000 next year.

32.     The XM + MP3 radio and the satellite broadcast constitute a single integrated XM delivery service — an XM + MP3 subscription service — that XM controls in every respect.  The proprietary XM + MP3 radios can receive only the heavily encrypted XM satellite radio transmissions.  When an individual purchases an inno, the individual must contact XM to have the inno activated so that it can receive and decrypt the XM transmissions and render them audibly.  XM equally retains the right and ability to deactivate any subscriber's radio at any time.  Further, XM can alter the inno's functionality by sending software updates directly to XM + MP3 subscribers through the Internet.

33.     Upon information and belief, an individual inno can automatically report back to XM certain subscriber-specific information, including, should XM so choose, information regarding the copies captured on each inno.  The inno is designed so that Napster, the online digital download service with which XM has partnered, is able to identify specific songs that subscribers have saved on their innos.  Upon information and belief, XM itself also could choose to identify specific songs saved on each inno through the Internet.

34.     XM also exercises significant control over the content each XM + MP3 subscriber can receive and store.  Through codes it embeds in all of its satellite transmissions, XM can mark particular sound recordings such that they cannot be stored or saved.  Thus, XM warns subscribers, "Some content cannot be recorded due to restrictions placed by the content owners."  Inno User Guide, at 80.  As this statement indicates, XM could prevent the creation of illegal permanent copies of Plaintiffs' protected sound recordings, but has chosen not to do so.  In addition, XM controls

subscribers' retention of their permanently saved sound recordings, and allows them to store these songs *only* so long as they maintain their subscription with XM.

35.   In addition to the complete control that XM exercises over the entire XM + MP3 service, several specific features of the service are particularly relevant to Plaintiffs' claims in this case. First, the service automatically — with no user input — makes a short-term "buffered" copy of every song to which the subscriber listens. This copy serves no legitimate purpose and is designed solely to enable and facilitate the storage and librarying of permanent unlawful copies.

36.   Second, the XM + MP3 service automatically transforms blocks of broadcast programming into playlists of disaggregated, individual tracks. Thus, a subscriber can receive from XM a digital playlist, complete with title and artist information, of all songs broadcast on a particular channel over a certain period of time. The subscriber then can simply scroll and click through the playlist, *without ever listening to the block of programming as broadcast*, and select which songs he or she would like to library for permanent storage and re-play, and which songs he or she would like to delete. The service is not designed for the purpose of permitting the user to listen to a program at a more convenient time than the hour of the broadcast. The opposite is the case. It is designed to free subscribers from ever having to experience XM's transmissions as a unified, integrated radio broadcast, and instead transforms XM's broadcasts into a service for the delivery of permanent downloaded copies of individual songs.

37.   Third, when listening to a live or pre-recorded block of programming, the subscriber may select, disaggregate, index, and permanently store individual songs with

the simple press of a button.  When a subscriber presses the record button *at any time during the playing of a song*, the inno instantly stores the entire song (including, as a result of the buffered copy, portions of the song transmitted prior to pressing the record button), creates a copy/phonorecord of the individual song file and stores it permanently in the subscriber's personal library.  This unlawful functionality is made all the more offensive by the so-called "ArtistSelect" and "TuneSelect" features.  These features permit subscribers to search all of XM's channels for particular songs and artists, so that they automatically receive an alert when their chosen songs or artists are played on any XM channel.  The subscriber can then switch channels with the touch of a button and record the selected song.

38.    Fourth, XM encourages subscribers to treat XM-recorded tracks interchangeably with their personal MP3 files.  In addition to librarying disaggregated songs from XM's transmissions, XM + MP3 subscribers also can load the device with digital music obtained from other sources.  When the inno is attached to a personal computer via a cable provided by XM, subscribers can transfer digital music files from their personal computers to the inno using a custom software application also provided by XM.  Subscribers can then create playlists that combine their own digital music files and the permanent copies delivered by XM.

39.    Collectively, these and other features render the XM + MP3 service a far cry from a traditional evanescent satellite radio broadcast, which is the only service that XM's statutory license permits it to provide.  The new XM + MP3 service is a download service, pure and simple, whereby subscribers are provided with permanent copies of

individual copyrighted sound recordings and are invited to store them for unlimited re-play for as long as the subscriber maintains his or her XM subscription.

40.     XM's unlawful distribution and reproduction of thousands of Plaintiffs' copyrighted works to current and potential XM subscribers is certain to harm legitimate CD sales and digital downloads of copyrighted sound recordings, as well as subscription services that provide legitimate downloads for a monthly fee – businesses that Plaintiffs and others have expended extraordinary efforts and resources to develop and preserve.  If XM subscribers can obtain permanent digital copies of popular sound recordings as part of their radio subscription service, they will have little or no incentive to purchase authorized digital copies of those songs on CD or from legitimate download services such as Apple's iTunes and similar services.  Whether or not every downloaded XM copy displaces a legitimate sale of a sound recording, the XM + MP3 service is certain to act as a substitute that displaces significant numbers of legitimate sales.

## COUNT I

### (Direct Copyright Infringement – Infringement of Plaintiffs' Distribution Right In Violation of 17 U.S.C. §§ 106(3), 501)

41.     Plaintiffs incorporate by reference paragraphs 1 - 40 as if set forth herein.

42.     Defendant, without the permission or consent of Plaintiffs, and without authority, is distributing Plaintiffs' copyrighted sound recordings to the public by making available and automatically disseminating to XM + MP3 subscribers copies of sound recordings contained in its satellite radio transmissions, including but not limited to, those copyrighted sound recordings listed in Exhibit A hereto.

43.     Such distribution of permanent copies of sound recordings to XM + MP3 subscribers, constitutes infringement of Plaintiffs' registered copyrights and the exclusive

rights under copyright in violation of 17 U.S.C. §§ 106(3).  Defendant's limited statutory right to perform publicly Plaintiffs' copyrighted sound recordings does not include the right to distribute those recordings.  *Id.* § 114(d)(4)(C) ("Nothing in [Section 114] shall be construed to annul, limit, impair, or otherwise affect in any way the ability of the owner of a copyright in a sound recording to exercise the rights under Sectio[n] . . . 106(3), or to obtain the remedies available under this title pursuant to such rights.").

44.     The infringement of Plaintiffs' rights in each of their copyrighted sound recordings constitutes a separate and distinct act of infringement.

45.     Defendant's acts of infringement are willful, intentional and purposeful, in disregard of and indifferent to the rights of Plaintiffs.

46.     As a direct and proximate result of Defendant's infringement of Plaintiffs' copyrights and exclusive rights under copyright, Plaintiffs are entitled to the maximum statutory damages, pursuant to 17 U.S.C. § 504(c), in the amount of $150,000 with respect to each work infringed, or such other amounts as may be proper under 17 U.S.C. § 504(c).  Alternatively, at Plaintiffs' election, pursuant to 17 U.S.C. § 504(b), Plaintiffs shall be entitled to their actual damages, including Defendant's profits from infringement, as will be proven at trial.

47.     Plaintiffs are entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

48.     Defendant's conduct is causing and, unless enjoined by this Court, will continue to cause Plaintiffs great and irreparable injury that cannot fully be compensated or measured in money.  Plaintiffs have no adequate remedy at law.  Pursuant to 17 U.S.C.

§ 502, Plaintiffs are entitled to a permanent injunction prohibiting infringement of Plaintiffs' copyrights and exclusive rights under copyright.

**COUNT II**

**(Unauthorized Digital Phonorecord Delivery in Violation of 17 U.S.C. §§ 115, 501)**

49.     Plaintiffs incorporate by reference paragraphs 1 - 40 as if set forth herein.

50.     Defendant, without the permission or consent of Plaintiffs, and without authority, is distributing by digital delivery Plaintiffs' copyrighted sound recordings to the public, including but not limited to those copyrighted sound recordings listed in Exhibit A hereto.  Such distributions by digital delivery are specifically identifiable to Defendant and constitute an unauthorized digital phonorecord delivery in violation of 17 U.S.C. §§ 115, 501.

51.     Defendant's limited statutory right to perform publicly Plaintiffs' copyrighted sound recordings does not give XM the right to make unauthorized digital phonorecord deliveries.  *See id.* § 115; S. Rep. No. 104-128, at 27 (1995) ("The digital transmission of a sound recording that results in the reproduction by or for the transmission recipient of a phonorecord of that sound recording implicates the exclusive rights to reproduce and distribute the sound recording."); *see also* H.R. Rep. No. 104-274, at 22 (1995) (same).

52.     The infringement of Plaintiffs' rights in each of their copyrighted sound recordings constitutes a separate and distinct act of infringement separately actionable under 17 U.S.C. § 115(c)(3)(H) as well as § 501.

53.     Defendant's acts of infringement are willful, intentional and purposeful, in disregard of and indifferent to the rights of Plaintiffs.

54.     As a direct and proximate result of Defendant's infringement of Plaintiffs' copyrights and exclusive rights under copyright, Plaintiffs are entitled to the maximum statutory damages, pursuant to 17 U.S.C. § 504(c), in the amount of $150,000 with respect to each work infringed, or such other amounts as may be proper under 17 U.S.C. § 504(c). Alternatively, at Plaintiffs' election, pursuant to 17 U.S.C. § 504(b), Plaintiffs shall be entitled to their actual damages, including Defendant's profits from infringement, as will be proven at trial.

55.     Plaintiffs are entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

56.     Defendant's conduct is causing and, unless enjoined by this Court, will continue to cause Plaintiffs great and irreparable injury that cannot fully be compensated or measured in money. Plaintiffs have no adequate remedy at law. Pursuant to 17 U.S.C. § 502, Plaintiffs are entitled to a permanent injunction prohibiting infringement of Plaintiffs' copyrights and exclusive rights under copyright.

## COUNT III

### (Direct Copyright Infringement – Infringement of Plaintiffs' Reproduction Right In Violation of 17 U.S.C. §§ 106(1), 501)

57.     Plaintiffs incorporate by reference paragraphs 1 - 40 as if set forth herein.

58.     Defendant, without authority, is making and causing to be made, unauthorized buffered copies of Plaintiffs' copyrighted sound recordings, including but not limited to those copyrighted sound recordings listed in Exhibit A hereto. Defendant operates the XM + MP3 service so that a subscriber's receipt of XM satellite transmissions simultaneously and automatically, without user interface, creates infringing copies of the sound recordings received in the transmission. Such copies serve no

purpose other than to facilitate the users' saving and librarying of massive unlawful collections of Plaintiffs' copyrighted sound recordings.

59.     By configuring the XM + MP3 service such that subscribers automatically receive copies of Plaintiffs' copyrighted sound recordings, Defendant is infringing Plaintiffs' registered copyrights and exclusive rights under copyright in violation of 17 U.S.C. §§ 106(1).  The Copyright Act explicitly contemplates that a digital transmission that results in the creation of an unauthorized copy of the transmitted recording "implicates the exclusive righ[t] to reproduce . . . the sound recording . . . embodied therein." *See* H.R. Rep. No. 104-274, at 22 (1995); 17 U.S.C. §§ 115(a), (d).

60.     The infringement of Plaintiffs' rights in each of their copyrighted sound recordings constitutes a separate and distinct act of infringement.

61.     Defendant's acts of infringement are willful, intentional and purposeful, in disregard of and indifferent to the rights of Plaintiffs.

62.     As a direct and proximate result of Defendant's infringement of Plaintiffs' copyrights and exclusive rights under copyright, Plaintiffs are entitled to the maximum statutory damages, pursuant to 17 U.S.C. § 504(c), in the amount of $150,000 with respect to each work infringed, or such other amounts as may be proper under 17 U.S.C. § 504(c).  Alternatively, at Plaintiffs' election, pursuant to 17 U.S.C. § 504(b), Plaintiffs shall be entitled to their actual damages, including Defendant's profits from infringement, as will be proven at trial.

63.     Plaintiffs are entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

64.     Defendant's conduct is causing and, unless enjoined by this Court, will continue to cause Plaintiffs great and irreparable injury that cannot fully be compensated or measured in money.  Plaintiffs have no adequate remedy at law.  Pursuant to 17 U.S.C. § 502, Plaintiffs are entitled to a permanent injunction prohibiting infringement of Plaintiffs' copyrights and exclusive rights under copyright.

**COUNT IV**

**("Ephemeral Recordings" - Infringement of Plaintiffs' Exclusive Reproduction Right in Violation of 17 U.S.C. §§ 106(1), 112(e) and 501)**

65.     Plaintiffs incorporate by reference paragraphs 1 - 40 as if set forth herein.

66.     Pursuant to Section 106(1) of the Copyright Act, Plaintiffs have the exclusive right to reproduce their copyrighted sound recordings.

67.     Notwithstanding Section 106(1), the parties' license agreement permits Defendant the limited right to make reproductions consistent with Section 112(e) of the Copyright Act.  That section grants to Defendant and others a very limited statutory license to make what is known as an "ephemeral recording" of Plaintiffs' copyrighted sound recordings.  A non-exhaustive list of Plaintiffs' copyrighted sound recordings for which Defendant has a limited license for ephemeral recordings and, on information and belief, has made such recordings, is attached hereto as Exhibit A.

68.     To come within the ambit of this very narrow statutory license, such ephemeral recordings may be retained and used only by the radio broadcaster that made them, solely for the purpose of facilitating the broadcaster's transmissions.  17 U.S.C. § 112(e)(1).  Notably, an express condition of the statutory license is that "no further phonorecords are reproduced from" each ephemeral copy made by the broadcaster.  *Id.* § 112(e)(1)(A).  Furthermore, the ephemeral recordings may be used "solely" for the

20

radio broadcaster's transmissions under the statutory license provided in Section 114(f), *id.* § 112(e)(1)(B), and, except for purposes of archival preservation, must be "destroyed within 6 months from the date the sound recording was first transmitted to the public using the phonorecord," *id.* § 112(e)(1)(C).

69.     Defendant is violating, and continues to violate on a daily basis, the narrow scope of its Section 112(e) license.  Because Defendant uses its ephemeral recordings not simply to enable the transmission of a radio broadcast, but instead to reproduce further phonorecords and to effect a distribution, Defendant is violating the conditions set forth in Sections 112(e)(1)(A) and (B).

70.     Based on information and belief, Defendant is also violating, and continues to violate on a daily basis, the narrow scope of its Section 112(e) license by retaining and using its ephemeral recordings for more than the 6 months allowed by law. *See id.* § 112(e)(1)(C).

71.     Accordingly, each such reproduction of Plaintiffs' copyrighted sound recordings in violation of 112(e) constitutes an unlawfully infringing reproduction in violation of the parties' license agreement and, therefore, in violation of Plaintiffs' exclusive reproduction rights provided in Section 106(1) of the Copyright Act.

72.     The infringement of Plaintiffs' rights in each of their copyrighted sound recordings constitutes a separate and distinct act of infringement.

73.     Defendant's acts of infringement are willful, intentional and purposeful, in disregard of and indifferent to the rights of Plaintiffs.

74.     As a direct and proximate result of Defendant's infringement of Plaintiffs' copyrights and exclusive rights under copyright, Plaintiffs shall be entitled to the

maximum statutory damages, pursuant to 17 U.S.C. § 504(c), in the amount of $150,000

with respect to each work infringed, or such other amounts as may be proper under 17

U.S.C. § 504(c).  Alternatively, at Plaintiffs' election, pursuant to 17 U.S.C. § 504(b),

Plaintiffs shall be entitled to their actual damages, including Defendant's profits from

infringement, as will be proven at trial.

75.     Defendant's conduct is causing and, unless enjoined by this Court, will

continue to cause Plaintiffs great and irreparable injury that cannot fully be compensated

or measured in money.  Plaintiffs have no adequate remedy at law.  Pursuant to 17 U.S.C.

§ 502, Plaintiffs are entitled to a permanent injunction prohibiting infringement of

Plaintiffs' copyrights and exclusive rights under copyright.

76.     Plaintiffs are entitled to their costs, including reasonable attorneys' fees,

pursuant to 17 U.S.C. § 505.

## COUNT V

### (Inducement of Copyright Infringement)

77.     Plaintiffs incorporate by reference paragraphs 1 - 40 as if set forth herein.

78.     XM + MP3 subscribers are creating unauthorized reproductions of

Plaintiffs' copyrighted sound recordings, including but not limited to those copyrighted

sound recordings listed in Exhibit A hereto, and therefore are liable for direct copyright

infringement of Plaintiffs' exclusive right of reproduction under 17 U.S.C. § 106(1).

Defendant is liable under the Copyright Act for the infringing acts of its XM + MP3

subscribers because it activates and maintains each XM + MP3 subscription with the

object of promoting its use to infringe Plaintiffs' copyrights.  By its clear expression and

other affirmative steps, Defendant is unlawfully fostering copyright infringement by its XM + MP3 subscribers.

79.    Defendant is fully aware that Plaintiffs' sound recordings are copyrighted and authorized for purchase through various outlets, including numerous lawfully authorized online digital download services. Indeed, XM + MP3 subscribers who also are customers of the Napster download service can purchase individual songs from Napster directly through their XM + MP3-compatible radios. Defendant is equally aware — and intends — that its XM + MP3 subscribers are using the radios' librarying function to create permanent infringing copies of Plaintiffs' copyrighted sound recordings obtained directly from XM. In fact, Defendant actively markets and advertises this capability as one of the radios' most attractive features, thereby actively encouraging its XM + MP3 subscribers to commit copyright infringement.

80.    In this way, *inter alia*, Defendant knowingly encourages its XM + MP3 subscribers to build unauthorized libraries of copyrighted works. The XM + MP3 advertising materials describe the XM + MP3 service as one that "delivers new music to you everyday and lets you choose tracks to create your own custom playlists," *see* XM Consumer Electronics Show 2006 Product Guide, and emphasize the ease of copying using the inno, urging subscribers to "Hear It, Click It, Save It!"  The XM website likewise encourages its XM + MP3 subscribers to infringe Plaintiffs' copyrighted sound recordings by urging them to "record with the touch of a button" and "store up to 50 hours of XM."  Moreover, by urging its XM + MP3 subscribers to "[m]ix recorded XM with your MP3s and CDs," Defendant encourages users to treat songs in the XM library just like their own digital music files: as permanent copies that substitute for purchased

recordings. *See* XM Consumer Electronics Show 2006 Product Guide. Indeed, the very name of the service, XM + MP3, reflects XM's desire to encourage subscribers to use their own MP3s and tracks recorded off XM interchangeably.

81.     Defendant's manifest object of fostering infringement is additionally demonstrated by, among other things, Defendant's refusal to take readily available steps to prevent infringement of Plaintiffs' copyrighted sound recordings, including by marking each as "restricted" and not available for unauthorized reproduction. Defendant could easily institute such protection, as the inno's User Guide indicates that XM may prevent some songs or channels from being copied. *See* inno User Guide at 80.

82.     The infringement of Plaintiffs' rights in each of their copyrighted sound recordings constitutes a separate and distinct act of infringement.

83.     Defendant's acts of infringement are willful, intentional and purposeful, in disregard of and indifferent to the rights of Plaintiffs.

84.     Through the conduct described above, Defendant is inducing the infringement of Plaintiffs' copyrights and exclusive rights under copyright, in violation of Sections 106 and 501 of the Copyright Act, 17 U.S.C. §§ 106, 501.

85.     As a direct and proximate result of Defendant's inducement of infringement of Plaintiffs' copyrights and exclusive rights under copyright, Plaintiffs are entitled to the maximum statutory damages, pursuant to 17 U.S.C. § 504(c), in the amount of $150,000 with respect to each infringing copy made by each subscriber, or such other amounts as may be proper under 17 U.S.C. § 504(c). Alternatively, at Plaintiffs' election, pursuant to 17 U.S.C. § 504(b), Plaintiffs shall be entitled to their

actual damages, including Defendant's profits from infringement, as will be proven at trial.

86.      Plaintiffs are entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

87.      Defendant's conduct is causing and, unless enjoined by this Court, will continue to cause Plaintiffs great and irreparable injury that cannot be fully compensated or measured in money.  Plaintiffs have no adequate remedy at law.  Pursuant to 17 U.S.C. § 502, Plaintiffs are entitled to a permanent injunction prohibiting further infringement of Plaintiffs' copyrights and exclusive rights under copyright.

## COUNT VI

### (Contributory Copyright Infringement)

88.      Plaintiffs incorporate by reference paragraphs 1 - 40 as if set forth herein.

89.      The XM + MP3 subscribers are creating unauthorized reproductions of Plaintiffs' copyrighted sound recordings, including but not limited to those copyrighted sound recordings listed in Exhibit A hereto, and therefore are guilty of direct copyright infringement of Plaintiffs' exclusive right of reproduction under 17 U.S.C. § 106(1). Defendant is liable as a contributory copyright infringer for the infringing acts of its XM + MP3 subscribers.  XM enables, facilitates, and materially contributes to each act of infringement by XM + MP3 subscribers.

90.      Defendant has actual and constructive knowledge that its XM + MP3 subscribers are using the librarying function to infringe Plaintiffs' copyrights by creating permanent copies of Plaintiffs' recordings.  Indeed, Defendant's marketing material and the inno User Guide indicate that Defendant believes the librarying function will be used

primarily to store songs rather than sporting events or other non-music broadcasts.  *See* inno User Guide at 40 (explaining how to use the "Lock Song" and "Lock Artist" functions).

91.     Defendant enables, facilitates and materially contributes to its XM + MP3 subscribers' copyright infringement by, among other things, activating and maintaining the activation of each XM + MP3 radio such that XM + MP3 subscribers can receive, decrypt and copy Defendant's transmission of Plaintiffs' copyrighted works; providing XM + MP3 subscribers with the functionality to automatically disaggregate and library individual sound recordings; instructing subscribers on how to create permanent copies of individual songs, *see* inno User Guide at 33-36, 40; and marking each sound recording it transmits as not restricted so as to make it available for unauthorized reproduction on the inno.

92.     The librarying function Defendant offers to XM + MP3 subscribers does not have substantial or commercially significant noninfringing uses.

93.     The infringement of Plaintiffs' rights in each of their copyrighted sound recordings constitutes a separate and distinct act of infringement.

94.     Defendant's acts of infringement are willful, intentional and purposeful, in disregard of and indifferent to the rights of Plaintiffs.

95.     Through the conduct described above, Defendant contributorily infringes Plaintiffs' copyrights and exclusive rights under copyright, in violation of Sections 106 and 501 of the Copyright Act, 17 U.S.C. §§ 106, 501.

96.     As a direct and proximate result of Defendant's contributory infringement of Plaintiffs' copyrights and exclusive rights under copyright, Plaintiffs are entitled to the

maximum statutory damages, pursuant to 17 U.S.C. § 504(c), in the amount of $150,000 with respect to each infringing copy made by each subscriber, or such other amounts as may be proper under 17 U.S.C. § 504(c).  Alternatively, at Plaintiffs' election, pursuant to 17 U.S.C. § 504(b), Plaintiffs shall be entitled to their actual damages, including Defendant's profits from infringement, as will be proven at trial.

97.     Plaintiffs are entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

98.     Defendant's conduct is causing and, unless enjoined by this Court, will continue to cause Plaintiffs great and irreparable injury that cannot be fully compensated or measured in money.  Plaintiffs have no adequate remedy at law.  Pursuant to 17 U.S.C. § 502, Plaintiffs are entitled to a permanent injunction prohibiting further infringement of Plaintiffs' copyrights and exclusive rights under copyright.

## COUNT VII

### (Vicarious Copyright Infringement)

99.     Plaintiffs incorporate by reference paragraphs 1 - 40 as if set forth herein.

100.     The XM + MP3 subscribers are creating unauthorized reproductions of Plaintiffs' copyrighted sound recordings, including but not limited to those copyrighted sound recordings listed in Exhibit A hereto, and therefore are liable for direct copyright infringement of Plaintiffs' exclusive right of reproduction under § 17 U.S.C. 106(1). Defendant has both the right and the ability to supervise its subscribers' infringing conduct, and to prevent its XM + MP3 subscribers from infringing Plaintiffs' copyrighted sound recordings.  The XM user agreement provides that subscribers may not "reproduce, rebroadcast, or otherwise transmit the programming, *create unauthorized recordings of*

27

*the programming*, charge admission specifically for the purpose of listening to the programming, or distribute play lists of the Services." *See* XM Satellite Radio Terms & Conditions ¶ 1(c), available at http://www.xmradio.com/get_xm/customer_service.html (last visited May 15, 2006) (emphasis added).  XM expressly reserves the contractual right to terminate an XM + MP3 subscriber's license for failure to comply with XM's terms and conditions.  *Id.* ¶ 8(c).

101.    Upon information and belief, Defendant customarily collects usage information from its subscribers, *see id.* ¶ 9 (stating that XM collects information regarding subscribers' listening habits), and has the technical ability to ascertain the specific copies that subscribers store on their innos.  Defendant is therefore able to detect infringement committed using its XM + MP3 service.

102.    Moreover, Defendant reserves for itself the technical ability to prevent copying on a song-by-song basis of any song Defendant chooses to protect.  *See* inno User Guide at 80.  Defendant also individually activates each XM + MP3 subscriber account and, absent activation by Defendant, such XM + MP3 subscribers could not gain access to Plaintiffs' copyrighted sound recordings.  Defendant, at any time it desired, could terminate infringing XM + MP3 subscribers.  Moreover, the fact that Defendant has the ability to erase all of a subscriber's recorded songs upon termination of her subscription indicates that Defendant is capable of erasing infringing songs from a subscriber's device at any point, should it choose to do so.

103.    Defendant has refused to take any action to prevent the widespread infringement by its XM + MP3 subscribers because Defendant receives a significant financial benefit directly attributable to the infringement by its XM + MP3 subscribers.

The ability to obtain digital copies of Plaintiffs' copyrighted sound recordings acts as a substantial draw for XM, attracting users to purchase the XM service, the XM + MP3 service, and the inno. Defendant thus derives substantial financial benefit from infringements of Plaintiffs' copyrights by its XM + MP3 subscribers.

104. The infringement of Plaintiffs' rights in each of their copyrighted sound recordings constitutes a separate and distinct act of infringement.

105. Defendant's acts of infringement are willful, intentional and purposeful, in disregard of and indifferent to the rights of Plaintiffs.

106. Through the conduct described above, Defendant is vicariously infringing Plaintiffs' copyrights and exclusive rights under copyright, in violation of Sections 106 and 501 of the Copyright Act, 17 U.S.C. §§ 106, 501.

107. As a direct and proximate result of Defendant's vicarious infringement of Plaintiffs' copyrights and exclusive rights under copyright, Plaintiffs are entitled to the maximum statutory damages, pursuant to 17 U.S.C. § 504(c), in the amount of $150,000 with respect to each infringing copy made by each subscriber, or such other amounts as may be proper under 17 U.S.C. § 504(c). Alternatively, at Plaintiffs' election, pursuant to 17 U.S.C. § 504(b), Plaintiffs shall be entitled to their actual damages, including Defendant's profits from infringement, as will be proven at trial.

108. Plaintiffs are entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

109. Defendant's conduct is causing and, unless enjoined by this Court, will continue to cause Plaintiffs irreparable injury that cannot be fully compensated or measured in money damages. Plaintiffs have no adequate remedy at law. Pursuant to 17

U.S.C. § 502, Plaintiffs are entitled to a permanent injunction prohibiting vicarious infringement of Plaintiffs' copyrights.

## COUNT VIII

### (Common-Law Copyright Infringement of Pre-1972 Recordings)

110.    Plaintiffs incorporate by reference paragraphs 1 - 40 as if set forth herein.

111.    Plaintiffs' Pre-1972 Recordings are subject to common-law copyright protection under the law of New York.  As the owners of valid common-law copyrights in the Pre-1972 Recordings, Plaintiffs possess the exclusive rights to manufacture, copy, sell, distribute, and otherwise exploit the recordings.

112.    Plaintiffs have not granted or licensed to Defendant the right to copy or distribute the Pre-1972 Recordings in any manner, including by digital transmission. Defendant's creation and dissemination of unauthorized copies of Plaintiffs' Pre-1972 Recordings, including but not limited to those recordings listed in Exhibit B hereto, therefore constitutes infringement of Plaintiffs' common-law copyright rights in the Pre-1972 Recordings.

113.    As a direct and proximate result of Defendant's wanton and reckless copyright infringement, Plaintiffs are entitled to compensatory damages in such amounts as will be proven at trial, as well as punitive damages.

114.    Defendant's conduct is causing and, unless enjoined by this Court, will continue to cause Plaintiffs irreparable injury that cannot be fully compensated or measured in money damages.  Plaintiffs have no adequate remedy at law and are entitled to injunctive relief prohibiting Defendant from further violating Plaintiffs' rights in the Pre-1972 Sound Recordings.

## COUNT IX

### (Unfair Competition as to Pre-1972 Recordings)

115.    Plaintiffs incorporate by reference paragraphs 1 - 40 as if set forth herein.

116.    Plaintiffs possess exclusive ownership interests in and to the Pre-1972 Recordings, and are engaged in the business of selling and distributing the Pre-1972 Recordings, both in the form of tangible CDs, vinyl records and cassettes, and also digitally, over the Internet (in the form of digital downloads) and otherwise.

117.    Through the conduct described above, Defendant is violating Plaintiffs' rights in the Pre-1972 Recordings, including but not limited to those recordings listed in Exhibit B hereto, and is guilty of unfair competition under the common law of the state of New York. By distributing and otherwise commercially exploiting unauthorized copies of the Pre-1972 Sound Recordings that compete with Plaintiffs' sales and distribution thereof, and otherwise taking advantage of and undermining Plaintiffs' substantial creative and financial investment in the Pre-1972 Recordings, Defendant is willfully, wantonly and unfairly appropriating Plaintiffs' rights to the Pre-1972 Recordings for its own commercial benefit.

118.    As a direct and proximate result of Defendant's wanton and reckless engagement in unfair competition, Plaintiffs are entitled to compensatory damages in such amounts as will be proven at trial, as well as punitive damages.

119.    Defendant's conduct is causing and, unless enjoined by this Court, will continue to cause Plaintiffs irreparable injury that cannot be fully compensated or measured in money damages. Plaintiffs have no adequate remedy at law and are entitled

to injunctive relief prohibiting Defendant from further violating Plaintiffs' rights in the Pre-1972 Sound Recordings.

WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

1.    For a declaration that Defendant's XM + MP3 subscription service willfully infringes Plaintiffs' copyrights both directly and secondarily, and constitutes unfair competition and other violations of New York state law.

2.    For a permanent injunction requiring that Defendant and Defendant's agents, servants, employees, officers, attorneys, successors, licensees, partners, and assigns, and all persons acting in concert or participation with each or any of them cease directly or indirectly infringing, or causing, enabling, facilitating, encouraging, promoting and inducing or participating in the infringement of, any of Plaintiffs' respective copyrights or exclusive rights protected by the Copyright Act or common law, whether now in existence or hereafter created.

3.    For statutory damages pursuant to 17 U.S.C. § 504(c), in such amounts as may be found or established at trial, arising from Defendant's violations of Plaintiffs' rights under the Copyright Act.  Alternatively, at Plaintiffs' election, pursuant to 17 U.S.C. § 504(b), Plaintiffs shall be entitled to their actual damages, including Defendant's profits from infringement, as will be proven at trial.

4.    For compensatory and punitive damages in such amounts as may be found or established at trial arising from Defendant's willful and wanton violations of New York state law.

5.      For Plaintiffs' costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

6.      For prejudgment interest according to law.

7.      For such other and further relief as the Court may deem just and proper.

May 16, 2006                              Respectfully submitted,

| | |
|---|---|
| Steven M. Marks<br>Kenneth L. Doroshow<br>Karyn A. Temple<br>RECORDING INDUSTRY<br>  ASSOCIATION OF AMERICA<br>1330 Connecticut Avenue, N.W.<br>Suite 300<br>Washington, DC 20036<br>tel. (202) 857-9637<br>fax (202) 775-7253 | Donald B. Verrilli, Jr. (DV-9260)<br>Steven B. Fabrizio (SF-8639)<br>Michael B. DeSanctis<br>JENNER & BLOCK LLP<br>601 Thirteenth Street, N.W.<br>Suite 1200 South<br>Washington, DC 20005-3823<br>tel. (202) 639-6000<br>fax (202) 639-6066<br><br>Ronald M. Daignault (RD-2672)<br>JENNER & BLOCK LLP<br>919 Third Avenue<br>37th Floor<br>New York, NY 10022-3908<br>tel. (212) 891-1600<br>fax (212) 891-1699 |

*Attorneys for Plaintiffs*