## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ATLANTIC RECORDING CORPORATION; | ) | |
| BMG MUSIC; CAPITOL RECORDS, INC.; | ) | |
| ELEKTRA ENTERTAINMENT GROUP INC.; | ) | Civil Action No. 06 CV 3733 |
| INTERSCOPE RECORDS; MOTOWN | ) | (DAB) (GWG) |
| RECORD COMPANY, L.P.; SONY BMG | ) | |
| MUSIC ENTERTAINMENT; | ) | |
| UMG RECORDINGS, INC.; | ) | Electronically Filed |
| VIRGIN RECORDS AMERICA, INC.; and | ) | |
| WARNER BROS. RECORDS INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| XM SATELLITE RADIO INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION .................................................................................................. 1

STATEMENT OF THE CASE ................................................................................ 2

      A.    The Governing Copyright Act Provisions ............................................. 3

      B.    XM's Infringing Conduct ................................................................... 4

THE LEGAL STANDARD ................................................................................... 7

ARGUMENT ...................................................................................................... 7

I.      Section 1008 Of The AHRA Does Not Immunize XM's Conduct. .................... 8

      A.    Section 1008 Does Not Apply To The XM + MP3 Service. .................... 8

      B.    XM's Reading Of Section 1008 Would Eviscerate Congress's Careful
           Compromises In Section 114. ............................................................ 14

II.     As A Matter Of Law, The Inno Cannot Be An AHRA Device. ....................... 17

III.    The Court Cannot, On A Motion To Dismiss, Make The Factual Findings
      Required To Conclude That The Inno Is A Covered Device Under The AHRA. ............ 21

      A.    XM Cannot Establish On The Pleadings That The Inno Qualifies As A
           DARD In Light Of The AHRA's Express Exclusions. ......................... 21

      B.    XM Cannot Show On The Basis Of The Pleadings That The Inno Qualifies
           As A DARD Under The AHRA's "Primary Purpose" Test. ................. 23

      C.    The Court Cannot Accept As True The Self-Serving Statements In
           The XM User And Product Guides. ..................................................... 24

IV.    XM Cannot Contend That The Record Companies' Claims Under Sections
      115 And 112 Of The Copyright Act, Or Its State Law Claims, Should Be
      Dismissed. ......................................................................................... 25

CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

## CASES

*AIG Global Securities Lending Corp. v. Banc of America Securities LLC*, No. 01 Civ. 11448 (JGK), 2005 WL 2385854 (S.D.N.Y. Sept. 26, 2005)............................................24

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001)............................................23

*APWU, AFL-CIO v. Potter*, 343 F.3d 619 (2d Cir. 2003) ............................................16

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002)....................................24

*Cosmas v. Hassett*, 886 F.2d 8 (2d Cir. 1989) ............................................24

*Fame Publishing Co. v. Alabama Custom Tape, Inc.*, 507 F.2d 667 (5th Cir. 1975)....................15

*Gant v. Wallingford Board of Education*, 69 F.3d 669 (2d Cir. 1995)........................................25

*Gomez v. Toledo*, 446 U.S. 635 (1980)........................................7

*International Audiotext Network, Inc. v. America Telephone & Telegraph Co.*, 62 F.3d 69 (2d Cir. 1995)........................................24

*Jackson National Life Insurance Co. v. Merrill Lynch & Co.*, 32 F.3d 697 (2d Cir. 1994)............7

*Jaghory v. New York State Department of Education*, 131 F.3d 326 (2d Cir. 1997) ....................7

*Kelly v. Robinson*, 479 U.S. 36 (1986) ........................................20

*Loving v. United States*, 517 U.S. 748 (1996) ........................................13

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 125 S. Ct. 2764 (2005) ..........................10

*Ragsdale v. Wolverine World Wide Inc.*, 535 U.S. 81 (2002) ........................................12

*Recording Industry Association of America v. Diamond Multimedia Systems, Inc.*, 180 F.3d 1072 (9th Cir. 1999) ..................................................2, 17, 18, 19, 21, 22, 23

*Santos v. Compagnie Nationale Air France*, 934 F.2d 890 (7th Cir. 1991) ....................................9

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993)........................................9, 14

*Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984)..............................11

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)........................................7

*United Savings Ass'n of Texas v. Timers of Inwood Forest Associates Ltd*, 484 U.S. 365 (1988) ...............................................................................................................................15

*United States v. Dauray*, 215 F.3d 257 (2d Cir. 2000) .................................................................17

*Weltover, Inc. v. Republic of Argentina*, 941 F.2d 145 (2d Cir. 1991), *aff'd*, 504 U.S. 607 (1992).................................................................................................................................9

## STATUTES

17 U.S.C. § 101 .............................................................................................................................3

17 U.S.C. § 106 .............................................................................................................................3

17 U.S.C. § 106(6) .......................................................................................................................15

17 U.S.C. § 112(e) .......................................................................................................................25

17 U.S.C. § 114 ..........................................................................................................1, 2, 8, 12, 15

17 U.S.C. § 114(d)(2) ....................................................................................................................3

17 U.S.C. § 114(d)(2)(B) .............................................................................................................16

17 U.S.C. § 114(d)(4)(B) ...............................................................................................................4

17 U.S.C. § 114(f) ..........................................................................................................................3

17 U.S.C. § 114(j) ........................................................................................................................16

17 U.S.C. § 115 ............................................................................................................................12

17 U.S.C. § 115(c)(3) ...................................................................................................................13

17 U.S.C. § 115(c)(3)(G) .............................................................................................................13

17 U.S.C. § 115(c)(3)(I) ..........................................................................................................13, 25

17 U.S.C. § 115(c)(6) ...................................................................................................................13

17 U.S.C. § 501 .............................................................................................................................3

17 U.S.C. § 1001(1) ......................................................................................................17, 18, 21, 22

17 U.S.C. § 1001(3) ......................................................................................................17, 23, 24

17 U.S.C. § 1001(3)(B)...........................................................................................23

17 U.S.C. § 1001(4)................................................................................................20

17 U.S.C. § 1001(5)................................................................................................22

17 U.S.C. § 1001(5)(A).................................................................................17, 20, 21

17 U.S.C. § 1001(5)(B).........................................................................18, 21, 22, 24

17 U.S.C. § 1001(5)(B)(i).......................................................................................23

17 U.S.C. § 1002....................................................................................................20

17 U.S.C. § 1004(b)................................................................................................20

17 U.S.C. § 1008.............................................................................................. *passim*

Fed. R. Civ. P. 8(c)...................................................................................................7

Fed. R. Civ. P. 12(b)(6)........................................................................................2, 7

## LEGISLATIVE MATERIAL

H.R. Rep. 102-1096 (1992)................................................................................ 10-11

H.R. Rep. No. 102-780(I) (1992)......................................................................11, 21

H.R. Rep. No. 102-873(I) (1992)......................................................................11, 21

H.R. Rep. No. 102-873(II) (1992) ..........................................................................20

S. Rep. No. 102-294 (1992)..........................................................10, 11, 20, 21, 23

S. Rep. No. 104-128 (1995), *reprinted in* 1995 U.S.C.C.A.N. 356.....................4, 15, 16

S. Rep. No. 106-42 (1999) ......................................................................................15

## MISCELLANEOUS

2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* (2000).......................................19

**INTRODUCTION**

XM is engaging in copyright infringement on a massive scale in defiance of express limitations Congress imposed on it in Section 114 of the Copyright Act.  XM does not contest that plaintiffs (the "Record Companies") allege valid claims of copyright infringement.  Rather, XM appears to believe it has found a loophole:  that Section 1008 of the Audio Home Recording Act of 1992 ("AHRA") allows XM to slip free of those express Section 114 limitations and enter the business of distributing copyrighted works without authority.  But the AHRA provides no immunity to XM.  Indeed, as will be shown, it is irrelevant to XM's conduct.  Because XM's motion to dismiss depends entirely on its misreading of the AHRA, the motion should be denied.

Section 114 of the Copyright Act – not the AHRA – governs satellite radio services such as XM.  Enacted in 1995 (three years *after* the AHRA), Section 114 gives XM a limited statutory license to perform copyrighted sound recordings publicly by transmitting them to subscribers in a radio-like service.  But Congress expressly forbade XM from using its public performance license to reproduce or distribute permanent copies of sound recordings without permission.  Ignoring those limitations, XM has engineered its new "XM + MP3" service to distribute to subscribers permanent, perfect digital reproductions that they can replay any time they choose – just as though they had purchased the recordings from Apple's iTunes or similar legitimate download services.  XM's conduct is copyright infringement, pure and simple.

XM is dead wrong in its claim that Section 1008 of the AHRA immunizes this infringement.  Even if the "inno" were a "digital audio recording device" within the meaning of the AHRA (which it is not), the text and legislative history – and every indicator of statutory meaning – demonstrate conclusively that Section 1008 does not apply to XM's conduct.  Section 1008 is a limited provision that bars suits only against manufacturers, importers and distributors of digital audio recording devices, and against consumers for noncommercial use of such

devices.  The claims alleged in the complaint fall into neither category; they are based on XM's *own infringing conduct* – its unlawful reproduction and distribution of copies of the Record Companies' works.  Stretching Section 1008 to immunize XM's conduct would obliterate the careful limits Congress built into XM's statutory license in Section 114.  It would also endorse rampant commercial infringement that threatens not only the Record Companies, but also the thousands of artists, songwriters and music publishers whose livelihood depends on receiving payment when their works are reproduced and distributed.

Moreover, Section 1008 cannot help XM for an even more basic reason:  the AHRA does not apply *at all* to computer-networked devices – including the inno – as the Ninth Circuit definitively held in *Recording Industry Ass'n of America v. Diamond Multimedia Systems, Inc.*, 180 F.3d 1072 (9th Cir. 1999).  The AHRA is therefore irrelevant here.  And even if the inno could theoretically qualify for AHRA protection, XM cannot establish its entitlement to immunity at this early stage in the litigation because the AHRA's applicability depends on disputed factual issues about the XM + MP3 service.  XM concedes as much by asking the Court to rely on improper extrinsic evidence consisting of self-serving hearsay that XM manufactured with this very suit in mind.  That is plainly improper under Rule 12(b)(6).

## STATEMENT OF THE CASE

XM does not even discuss the key provisions of the Copyright Act that govern this case. That omission is telling.  Once one understands how the Copyright Act applies to XM's satellite radio service, XM cannot possibly sustain its claim of immunity under Section 1008 of the AHRA.  The reality is that XM is gaming the system – and defying express restrictions Congress imposed upon it – in order to capture for itself the value of copyrights that rightly belongs to Record Companies, artists and songwriters.

2

A.        **The Governing Copyright Act Provisions**

The Record Companies own the copyright in most of the sound recordings that XM transmits to subscribers on its satellite radio service.  Compl. ¶ 15.  By virtue of their copyright ownership, the Record Companies have "exclusive rights" under the Copyright Act, *inter alia*, to (i) "reproduce the copyrighted work[s]," (ii) "distribute copies" of the copyrighted works, and (iii) "perform the copyrighted work[s] publicly by means of a digital audio transmission."  17 U.S.C. § 106.  Thus, absent permission, XM infringes the Record Companies' copyrights by (i) reproducing (*i.e.* making copies of) copyrighted sound recordings; (ii) distributing copies of sound recordings to its subscribers; or (iii) publicly performing sound recordings by transmitting them in digital format so that their subscribers may listen to them.  17 U.S.C. § 501 ("Anyone who violates any of the exclusive rights of the copyright owner . . . is an infringer").

In 1995, Congress enacted a law that gave XM and other digital satellite radio companies a limited permission – called a "compulsory" or "statutory" license – to publicly perform copyrighted sound recordings by digital transmission.  17 U.S.C. § 114(d)(2).  This license authorizes XM to publicly perform sound recordings in radio-like transmissions.  The essential characteristic of a public performance is that it is evanescent – a subscriber can listen to the performance at the time it is transmitted, but does not obtain a permanent reproduction of it.  17 U.S.C. § 101 ("To 'perform' a work means to recite, render, play, dance or act it").  In return for this compulsory license, XM must pay a statutory royalty (which is based on the radio-like performances only).  17 U.S.C. § 114(f).

Congress strictly limited XM's license to evanescent public performances, and gave XM no right to distribute or to reproduce copyrighted sound recordings in more permanent form.  Congress expressly provided that "[n]othing" in the grant of this limited license "annuls or limits in any way . . . the exclusive rights in a sound recording or the musical work embodied therein

under sections 106(1) [reproduction] . . . and 106(3) [distribution]."  17 U.S.C. § 114(d)(4)(B).

Congress knew that satellite radio's digital technology could, if left unchecked, pose a grave

threat to copyright owners' "ability to control the distribution of their product by digital

transmission," because that technology allows satellite services to disseminate, and subscribers

to receive, perfect, permanent digital copies of copyrighted songs.  *See* S. Rep. No. 104-128, at

15 (1995), *reprinted in* 1995 U.S.C.C.A.N. 356, 362.  Congress therefore made crystal clear that

XM was forbidden from leveraging its limited performance license by expanding into the

business of reproducing and distributing copyrighted sound recordings.

> **B.     XM's Infringing Conduct**

With its "XM + MP3" service, XM has gone far beyond the public performance of sound

recordings.  Instead of providing just a radio service, XM now offers an end-to-end content

delivery service that provides XM subscribers with permanent digital copies of copyrighted

songs – obliterating the express limitations contained in Section 114.  Compl. ¶ 2.

XM provides this service by means of its closed and proprietary system, every feature

and function of which XM controls – from the origination of its satellite signal through the

subscribers' use of their XM receivers to play back or record XM's transmissions.  *Id.* ¶¶ 26, 32.

XM's transmission may be received only by people who subscribe to XM's service for a

monthly fee, and who purchase an XM-sanctioned radio receiver.  *Id.*  XM "activates" each

receiver individually, *only then* enabling the receiver to decrypt XM's encrypted transmissions.

*Id.*  Thus, subscribers receive only the content XM authorizes them to receive, and can store and

play back that content only in the manner that (and for as long as) XM permits.

The new XM + MP3 service operates using a device called the inno.  *Id.* ¶¶ 29-30.[1]  XM does not manufacture the inno.  And although XM claims it distributes the inno, that is not alleged in the complaint and is not material.  What is material is that XM controls everything the inno does when used in conjunction with XM's service.  XM has exercised that control to push well beyond the limits of its statutory public performance license.

With XM + MP3, subscribers do not press a record button at the start of a song to make copies from live radio broadcasts as people have done for years.  Rather, whenever an XM subscriber turns on the inno, the XM + MP3 service *automatically* makes a perfect individual copy of every song the subscriber receives.  *Id.* ¶ 35.  With the touch of a button at any point in a song's transmission, subscribers can make those copies permanent and retain them for as long as the subscriber maintains a subscription.  *Id.* ¶¶ 35, 37.  Even more egregiously, the XM + MP3 service completely divorces the delivery of digital copies from the licensed public performance of the sound recordings.  XM + MP3 allows subscribers to program the devices to receive large blocks of programming, which are then automatically transformed into individual song files just like an MP3 file.  The subscriber receives these copies even when the subscriber is not listening to the programming being broadcast – indeed, even when the inno is turned off.  XM Mem. Ex. 3, at 36.  After receiving a block of programming, "[t]he subscriber then can simply scroll and click through the playlist, *without ever listening to the block of programming as broadcast*, and select which songs he or she would like to library for permanent storage and re-play, and which songs he or she would like to delete."  Compl. ¶ 36.  In other words, XM + MP3 subscribers routinely receive deliveries of permanent digital copies of copyrighted songs without ever

---

[1] The complaint alleges that XM + MP3 also operates using other devices – the Helix and the Nexus.  XM's motion to dismiss refers briefly to these devices, but presents its argument in terms of only the inno.  The Record Companies will do the same to avoid confusion.

listening to the public performance – the actual live transmission – of those songs.  This is plainly a service that distributes reproductions to subscribers, not a service that provides public performances.

In addition, the XM + MP3 service allows subscribers to make copies on the inno of their existing MP3 song files stored on their personal computers.  *See* Compl. ¶ 38.  Subscribers can thus use the XM + MP3 service as a digital download provider, and their "inno" as a substitute for an iPod.  And that is exactly what XM intends.  XM touts the service's superiority to Apple's iPod and iTunes by advertising XM + MP3 as a direct substitute with additional capabilities: "It's Not A Pod, It's The Mothership."  *See* XM Mem., Ex. 2.

XM has thus converted its narrow public performance license into a sweeping method for reproducing and distributing copyrighted works to subscribers without permission.  By these means, XM is cannibalizing the authorized market for digital downloads of sound recordings (as well as for CDs).  And while XM loudly protests that it is not a "download service," XM Mem. at 10, the undeniable reality is that XM + MP3 delivers exactly the same thing a download service such as iTunes delivers – perfect digital copies of the Record Companies' copyrighted sound recordings.  For subscribers, it is no different than downloading from iTunes or other legitimate music distribution services – except that the subscriber does not pay (beyond the monthly XM subscription fee) to obtain the copy.

Of course, unlike XM, legitimate digital download services have obtained licenses from the copyright owners for reproduction and distribution of copyrighted works and pay royalties for each sale they make.  The Record Companies and recording artists therefore receive compensation through these legitimate services.  The music publishers and songwriters, who have their own separate copyrights in the underlying musical works on the sound recordings,

also receive compensation for every sale on iTunes or similar legitimate services.  In vivid

contrast, XM pays copyright owners nothing for the distribution of their works.  XM is instead

making its own satellite radio service more valuable – allowing it to attract more subscribers – by

giving subscribers perfect digital copies of copyrighted works without paying anything other

than subscription fees to XM.  Thus, XM usurps for itself the value of copyrights it does not own

– exactly what Congress sought to prevent by building strict limits into Section 114.

## THE LEGAL STANDARD

In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must accept

"as true the facts alleged in the complaint and draw[] all reasonable inferences in the plaintiff's

favor."  *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 699-700 (2d Cir. 1994).

Because the Federal Rules "rel[y] on liberal discovery rules and summary judgment motions,"

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002), the "court may not dismiss a complaint

unless it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff

can prove no set of facts which would entitle him to relief," *Jaghory v. New York State Dep't of

Educ.*, 131 F.3d 326, 329 (2d Cir. 1997) (internal quotation marks omitted).

## ARGUMENT

XM's motion to dismiss is meritless.  Although XM chides the Record Companies for

failing to address Section 1008 of the AHRA in the complaint (*see* XM Mem. at 1-2), Section

1008 is an immunity from suit and "the burden of pleading it rests with the defendant."  *Gomez

v. Toledo*, 446 U.S. 635, 640-41 (1980); *see also* Fed. R. Civ. P. 8(c).  As will be shown, XM

cannot rely on Section 1008, for three independent reasons.

*First*, even if the inno were a "digital audio recording device" for AHRA purposes (and it

is not), Section 1008 provides XM no defense.  Section 1008 does not immunize a service such

as XM + MP3 that delivers permanent digital copies of sound recordings without permission

from the copyright owners.  The text, legislative history and statutory context are crystal clear on this point.  Indeed, XM's reading of Section 1008 would destroy the careful limits Congress imposed on the compulsory license for public performances in Section 114 of the Copyright Act – leaving copyright owners remediless in the face of massive commercial infringement.

*Second*, express AHRA provisions and the leading case interpreting them – which XM ignores – demonstrate that the inno is not a "digital audio recording device" *as a matter of law*. Thus, XM has no basis for invoking the AHRA at all.

*Third*, and in all events, XM cannot establish on the basis of the complaint's allegations that the inno is, *as a matter of fact,* a "digital audio recording device" covered by the AHRA. XM ignores crucial statutory requirements, and improperly asks the Court not only to consider extrinsic evidence, but to accept as *conclusively true* XM's own self-serving hearsay statements.

## I.      Section 1008 Of The AHRA Does Not Immunize XM's Conduct.

### A.      Section 1008 Does Not Apply To The XM + MP3 Service.

XM's motion rests on the fallacious premise that Section 1008 of the AHRA bars all copyright claims related to a "digital audio recording device," no matter how tangential.  *See* XM Mem. at 13, 14, 20.  The language of Section 1008, however, is much more limited.  It provides that

> [n]o action may be brought under this title alleging infringement of copyright *based on the manufacture, importation, or distribution* of a digital audio recording device . . . or *based on the noncommercial use by a consumer* of such a device . . . for making digital musical recordings . . . .

17 U.S.C. § 1008 (emphasis added).  Every indicator of statutory meaning points decisively to the conclusion that this provision simply does not cover the conduct alleged in the Record Companies' complaint against XM, and thus does not immunize XM.

8

*First*, the plain meaning of the text forecloses XM's defense.  On its face, Section 1008 bars only infringement claims that are either *"based on* the manufacture, importation or distribution" of digital audio recording devices, or *"based on* the noncommercial use by a consumer" of such devices.  *Id.* (emphasis added).  A claim is "based on" specified conduct only where that conduct, *standing alone*, establishes liability.  *See Santos v. Compagnie Nationale Air France*, 934 F.2d  890, 893 (7th Cir. 1991) ("An action is based upon the elements that prove the claim, no more and no less").

The Supreme Court has specifically so held in closely analogous circumstances involving the scope of the Foreign Sovereign Immunities Act.  *See Saudi Arabia v. Nelson*, 507 U.S. 349, 357 (1993).  In deciding whether a claim was "based upon" the commercial activity of a foreign sovereign (and therefore outside the statutory immunity), the Court noted that the term "based upon" was not defined in the Act, but that

> guidance is hardly necessary.  In denoting conduct that forms the "basis" or "foundation" for a claim, *see* Black's Law Dictionary 151 (6th ed. 1990) (defining "base"); Random House Dictionary 172 (2d ed. 1987) (same); Webster's Third New International Dictionary 180, 181 (1976) (defining "base" and "based"), *the phrase is read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case.*

507 U.S. at 357 (emphasis added); *see also Weltover, Inc. v. Republic of Argentina*, 941 F.2d 145, 150 (2d Cir. 1991) (in deciding which actions are "based upon" foreign sovereign's activity, the court must "isolate the specific conduct that underlies the suit, rather than focusing on the broad program or policy of which the transaction is a part"), *aff'd*, 504 U.S. 607 (1992) (internal quotation marks omitted).

If the term "based on" is given its ordinary meaning as set forth in *Nelson*, Section 1008 precludes only two categories of infringement claims:  (i) those against manufacturers, importers and distributors of covered "digital audio recording devices" *for the act* of having manufactured,

imported or distributed them, and (ii) those against consumers *for the act* of making unauthorized copies. A claim is "based on" manufacture, importation or distribution of a "digital audio recording device" only where the acts of manufacturing, importing, or distributing the device is the conduct on which liability is premised. As a matter of logic and common sense, this aspect of Section 1008 immunizes only those who do the manufacturing, importing and distributing. And what it protects against is a claim that the manufacturer, importer or distributor should be held liable as a contributory or secondary infringer when consumers use the devices to make noncommercial copies. *See generally Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 125 S. Ct. 2764, 2776 (2005) (describing contours of secondary copyright liability).

Similarly, a claim is "based on the noncommercial use by a consumer" only when the claim alleges, without more, that the consumer is using the device to commit infringement. This aspect of Section 1008 protects consumers against *direct* liability for their own infringing acts. It does not protect the infringing conduct of anyone else. S. Rep. No. 102-294, at 52 (1992) (Section 1008 "does not purport to resolve, nor does it resolve, whether the underlying conduct [of the user] is or is not infringement. The committee intends the immunity from lawsuits to provide full protection *against the specified types of copyright infringement actions*, but it has not addressed the underlying copyright infringement issue in order to minimize the chances that a resolution of that issue might be interpreted to have applicability with respect to *other conduct* or other technologies.") (emphasis added).

*Second*, the AHRA's legislative history explicitly confirms that Section 1008's prohibition extends only to "certain copyright infringement actions *against consumers* for making analog or digital audio copies for private noncommercial use and *against manufacturers and importers for making such devices available to American consumers*." H.R. Rep. 102-1096,

at 217 (1992) (emphasis added); *accord* H.R. Rep. No. 102-873(I), at 24 (1992) (Section 1008 is limited to "*contributory* infringement actions under title 17 *against* manufacturers, importers and distributors" of digital audio recording devices) (emphasis added); H.R. Rep. No. 102-780(I), at 28-29 (1992) (Section 1008 immunity is limited to claims "*against a person for using these recorders*" for noncommercial use) (emphasis added).

It is hardly surprising that the statutory text of Section 1008 does not stretch as far as XM claims it does.  The AHRA was enacted in the wake of the Supreme Court's decision in *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), which recognized that manufacturers could be subject to secondary copyright liability based on the mere manufacture or distribution of copying devices if consumers used the devices to infringe.  In response to the filing of a case alleging copyright infringement against the manufacturer of a newly introduced digital audio tape recorder, Congress enacted into law a compromise worked out by the interested stakeholders in order to eliminate uncertainty.  Consumer electronics companies were authorized to introduce "digital audio recording devices" without incurring contributory or secondary liability solely for having manufactured or distributed the devices, and consumers were allowed to use the devices without fear of suit.  *See, e.g.,* H.R. Rep. 102-873(I), at 11-12; S. Rep. 102-294, at 30-32, 51.  In exchange, consumer electronics manufacturers were required to build in technology to prevent serial copies (*i.e.* copies from copies), and were required to pay a nominal royalty to copyright owners for each device and each unit of copying media (*i.e.* tapes, CDs, etc.) sold.

But XM is neither a manufacturer of a "digital audio recording device" nor a consumer who uses the device, and the Record Companies' claims for unlawful reproduction and distribution of their works are simply not "based on" the inno.  The AHRA simply does not

11

cover the conduct alleged in the complaint.  Indeed, Congress did not even enact the provisions in Section 114 governing XM until several years after the AHRA was enacted.  XM and its *amici* cite legislative history suggesting that the AHRA was meant to end all litigation concerning "digital audio recording devices," but that legislative history does not remotely suggest an intent on Congress's part to protect anyone other than a manufacturer, importer or distributor of a recording device or a consumer.  It says nothing about a satellite service that delivers permanent digital copies to consumers in excess of a statutory license that expressly forbids it from doing so.

Stretching the AHRA to bring XM's conduct under its protective mantle would upend the careful balance struck in that legislation.  Copyright owners would be denied any remedy against conduct that Congress did not even consider when it enacted the AHRA.  If Section 1008 meant what XM now claims, copyright owners would never have agreed to the nominal royalty payments provided for in the AHRA because those payments fall far short of compensating copyright owners for the lost sales that would result from the massive distribution of copyrighted songs through services such as XM + MP3.  *See Ragsdale v. Wolverine World Wide Inc.*, 535 U.S. 81, 94 (2002) ("Congress resolved the conflict by choosing a middle ground. . . . Courts . . . must respect and give effect to these sorts of compromises").  And that problem would only increase over time, as the storage capacity of devices like the inno continue to increase exponentially.

*Third*, *s*ubsequent legislation underscores that Section 1008 is limited to claims *against* manufacturers, importers and distributors, and claims *against* individual consumers.  In a 1995 amendment to Section 115 of the Copyright Act, Congress gave copyright owners a new express right of action against unauthorized "digital phonorecord deliveries" – *i.e.*, digital transmissions

of sound recordings that result in the recipient of the transmission receiving a permanent copy of

the recording.  17 U.S.C. § 115(c)(3).  In doing so, Congress made clear *both* that this new

remedy supplemented (and did not supplant) copyright owners' traditional remedies for

unauthorized reproduction and distribution, *id.* § 115(c)(3)(G), (c)(6), *and* that Section 1008 did

not immunize such unauthorized transmissions:

> Nothing in section 1008 shall be construed to prevent the exercise of the rights
> and remedies allowed by this paragraph, paragraph (6), and chapter 5 in the event
> of a digital phonorecord delivery, except that no action alleging infringement of
> copyright may be brought under this title *against a manufacturer, importer or
> distributor* of a digital audio recording device, a digital audio recording medium,
> an analog recording device, or an analog recording medium, or *against a
> consumer, based on the actions described in such section.*

17 U.S.C. § 115(c)(3)(I) (emphasis added).

This provision sets forth a rule of construction ("[n]othing in Section 1008 shall be

construed . . .") that defines the scope of Section 1008 generally, rather than simply narrowing

Section 1008 as it pertains to Section 115.  Indeed, when Congress confirmed the proper

construction of Section 1008, it spoke broadly of claims asserted under "this title" – *i.e.*, the

Copyright Act – not just under Section 115.  *Id.*  Such "[s]ubsequent legislation declaring the

intent of an earlier statute is entitled to great weight in statutory construction."  *Loving v. United

States*, 517 U.S. 748, 770 (1996).  Thus, Congress could hardly have been clearer that Section

1008 does not apply in the circumstances of this case, which involves neither a claim "against a

manufacturer, importer or distributor" nor a claim "against a consumer."

*Finally,* even if Section 1008 could be read to reach beyond suits against manufacturers,

importers and distributors and suits against individual consumers, the provision cannot possibly

be stretched so far as to cover XM in this case.  In its motion to dismiss, XM effectively rewrites

the Record Companies' complaint to convey the impression that the Record Companies' claims

are based entirely on two separate actions – XM's public performances of sound recordings via

13

digital transmissions (for which XM has a Section 114 license) and its subscribers' independent use of the inno to copy those transmissions. But that is false. As demonstrated (*see* pages 4-7, *supra*), XM has engineered XM + MP3 as a unified service that delivers subscribers perfect digital copies of copyrighted sound recordings, and allows subscribers to receive and permanently maintain copies of those recordings without ever listening to any "public performance" of the recorded works. These allegations are in no way "based on" either the manufacture, importation, or distribution of the inno or its noncommercial use by subscribers because none of that conduct, *standing alone*, establishes liability. *See Saudi Arabia v. Nelson*, 507 U.S. at 357.

Stretching Section 1008 to cover XM's conduct would produce absurd results by immunizing deliberate, commercial acts of copyright infringement as long as they involve in any way a consumer using a "digital audio recording device" to make infringing copies. For example, if XM's reading of Section 1008 is correct, XM can simply displace Apple's iTunes and begin offering its subscribers the option of downloading digital copies of copyrighted songs directly from an XM website to their devices for a fee, and then defend against a suit alleging infringement of the copyright owners' distribution rights by claiming that the suit is "based on" its subscribers' use of the device to make personal copies. It is perfectly clear that Congress intended nothing of the sort when it enacted Section 1008. Yet these are precisely the results that XM's reading of Section 1008 would necessarily produce.

> **B.      XM's Reading Of Section 1008 Would Eviscerate Congress's Careful Compromises In Section 114.**

Even if the phrase "based on," considered in isolation, creates some ambiguity about the scope of Section 1008 – and it does not, for the reasons set forth above – "[a] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . .

because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *United Savings Ass'n of Texas v. Timers of Inwood Forest Assocs. Ltd*, 484 U.S. 365, 371 (1988). Considered within the broader statutory context of the Copyright Act, the phrase "based on" cannot possibly expand Section 1008 to confer the immunity that XM claims. Such a result would do violence to the carefully wrought compromises contained in Section 114 of the Copyright Act – hardly a result "compatible with the rest of the law."

Section 114 strikes a careful balance between the interests of satellite radio services and the interests of copyright owners. On the one hand, Congress granted a compulsory public performance license, which allows satellite radio services to transmit copyrighted sound recordings to its subscribers in digital format – conduct that would otherwise infringe the copyright owners' exclusive rights under 17 U.S.C. § 106(6). On the other hand, Congress granted a license *only* for public performances, and expressly provided that satellite services could not lawfully reproduce or distribute copyrighted sound recordings to their subscribers as part of their service. *See* S. Rep. 104-128, at 15, *reprinted in* 1995 U.S.C.C.A.N. at 362 (recognizing importance of the copyright owners' "ability to control the distribution of their product by digital transmission"). Congress was well aware that satellite services could abuse the public performance license by converting it into a means for distributing unauthorized digital copies of sound recordings – creating a grave threat to copyright owners' valuable rights, and usurping the legitimate market for distribution of digital works. *See generally Fame Publ'g Co. v. Ala. Custom Tape, Inc.*, 507 F.2d 667, 670 (5th Cir. 1975); S. Rep. No. 106-42, at 13 (1999) ("As with all compulsory licenses, these explicit limitations are consistent with the general rule that, because compulsory licenses are in derogation of the exclusive rights granted under the Copyright Act, they should be interpreted narrowly").

15

In fact, Congress was so concerned about these risks that it went beyond direct prohibitions of unauthorized reproduction and distribution, and built in prophylactic protections to prevent satellite services from accomplishing these harmful results indirectly. Thus, Congress forbade Section 114 licensees from providing advance notice of the songs they intend to play and from playing more than a limited number of songs from any one artist during a given period of time. 17 U.S.C. § 114(d)(2)(B). Likewise, Congress forbade satellite radio services from offering "interactive" services that allow subscribers to create "personalized" programming or choose what they want to hear "on demand." *Id.* § 114(j). Congress recognized that consumers would have no reason to purchase sound recordings if they had "personal" or "on demand" access to music of their choice via satellite services. As Congress explained, such practices are "likely to have a significant impact on traditional record sales" and therefore threaten "the livelihoods of those whose income depends upon revenues derived from traditional record sales." S. Rep. 104-128, at 16, *reprinted in* 1995 U.S.C.C.A.N. at 363.

The complaint alleges that XM is doing the very things that Congress forbade in Section 114 – reproducing and distributing copyrighted songs without authorization. If Section 1008 immunizes such conduct, then the direct restrictions in Section 114 have no meaning. Similarly, Section 114's prophylactic restrictions would be a waste of time because XM would have the right to inflict *directly* the harm that Congress was trying to prevent XM from inflicting *indirectly*. It is hornbook law, however, that statutes "should be construed . . . so that one section will not destroy another." *See APWU, AFL-CIO v. Potter*, 343 F.3d 619, 626 (2d Cir. 2003) (quotation marks omitted). That proposition applies with particular force because XM is interpreting the earlier-enacted Section 1008 to nullify the effectiveness of the later-enacted Section 114. As the Second Circuit has explained, "a statute should be construed to be consistent

with subsequent statutory amendments," not to eviscerate them.  *United States v. Dauray*, 215 F.3d 257, 263 (2d Cir. 2000).

Thus, for all the foregoing reasons, Section 1008 cannot be construed to immunize the conduct of XM at issue in this case.

## II.    As A Matter Of Law, The Inno Cannot Be An AHRA Device.

XM's motion to dismiss fails for a second reason:  a device such as the inno cannot be a "digital audio recording device" ("DARD") within the meaning of the AHRA – as the Ninth Circuit has expressly held.  *See Diamond Multimedia*, 180 F.3d 1072.  Although XM simply assumes with cursory analysis that the inno is covered by the AHRA, in fact the AHRA does not extend to devices – including the inno – that receive digital sound recordings transmitted from a computer or that store sound recordings on computer-like memory.  Indeed, if XM's reading of the AHRA were correct, then the tens of millions of iPods and other MP3 players on the market today would all be unlawful because none comply with the AHRA.

To understand why an inno is not a DARD governed by the AHRA, it is necessary to follow a series of "nested definitions" in the statute.  *Diamond Multimedia*, 180 F.3d at 1075. The four relevant provisions are these:

- A DARD is a device whose recording function "is designed or marketed for the primary purpose" of making "digital audio copied recordings."  17 U.S.C. § 1001(3).

- A "digital audio copied recording," in turn, is a reproduction of a "digital music recording."  17 U.S.C. § 1001(1).

- A "digital musical recording" is a "material object (i) in which are fixed, in a digital recording format, only sounds, and material, statements, or instructions incidental to those fixed sounds, if any …."  17 U.S.C. § 1001(5)(A).

- Expressly excluded from the from the definition of "digital musical recording" is any material object "in which one or more computer programs are fixed, except that a digital musical recording may contain statements or instructions constituting the fixed sounds and incidental material, and statements or

17

instructions to be used directly or indirectly in order to bring about the perception, reproduction, or communication of the fixed sounds and incidental material."  17 U.S.C. § 1001(5)(B).

Both the source and the final product of a "digital audio copied recording" must be a "digital musical recording."  17 U.S.C. § 1001(1) (a "digital audio copied recording" must result in a "digital musical recording" whether "made directly from **another** digital musical recording or indirectly from a transmission") (emphasis added); *see also Diamond Multimedia*, 180 F.3d at 1080.  If copies made onto the inno are not "digital musical recordings," then the inno does not make "digital audio copied recordings" and cannot be a "digital audio recording device."

Remarkably, XM ignores *both* the AHRA definition of "digital musical recording" and the leading *Diamond Multimedia* decision interpreting it.  That decision establishes that the recordings made onto devices such as the inno are not – *and cannot be* – "digital musical recordings."  After exhaustive analysis, the Ninth Circuit held that "[t]here are simply no grounds in either the plain language of the definition or in the legislative history for interpreting the term 'digital musical recording' to include songs fixed on computer hard drives."  180 F.3d at 1077.  Rather, the AHRA definition of "digital musical recording" encompasses *only* the sort of physical media in which songs were customarily fixed at the time: CDs, digital audio tape (or DAT), digital compact cassettes, mini-discs, and the like.  As the Ninth Circuit explained:

> The Senate Report further states that the definition "is intended to cover those objects commonly understood to embody sound recordings and their underlying works.  A footnote makes explicit that this definition **only extends** to the material objects in which songs are normally fixed: "**[t]hat is recorded compact discs, digital audio tapes, audio cassettes, long-playing albums, digital compact cassettes, and mini-discs**."

*Id.* at 1077 (internal citations omitted; emphasis added); *id.* at 1078 ("[T]he Rio [MP3 player] does not reproduce files from something that falls within the plain language of the basic *definition* of a digital musical recording").

18

The computer memory in the inno is precisely the sort of object that *Diamond Multimedia* holds cannot be a "digital musical recording" under the AHRA.

The Ninth Circuit acknowledged that, in the new computer networked world, where recordings are copied onto nontraditional media such as computer hard drives and MP3 players, its decision would "effectively eviscerate" the AHRA.  *Diamond Multimedia*, 180 F.3d at 1078; *see also* 2 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 8B.02[1][a][ii], at 8B-29 (2000) (noting that "by the time that consumer interest in digital music finally percolated into the courts, the technology had already shifted sufficiently to place the affected conduct outside the AHRA").  Nevertheless, the AHRA "seems to have been expressly designed" to generate that result.  *Diamond Multimedia*, 180 F.3d at 1078.  Since *Diamond Multimedia*, networked or computer-compatible digital recording devices such as the iPod uniformly have been considered outside the AHRA – and electronics manufacturers have made massive investments in reliance on that understanding.

The compromise struck by the AHRA, moreover, makes sense only if understood in the context of *Diamond Multimedia*'s holding.  The premise of the AHRA was a concern about "serial copying" from one physical medium to another – that is, for example, a copy of a commercial CD made onto a recordable CD (also known as a "CD-R"), which could be copied again and again.  Each successive copy retained the sound quality of the original master recording because digital technology (in stark contrast to analog technology) could reproduce copy after copy without any loss of quality.  *Id.* at 1073.

The nature of the copying contemplated by the AHRA was consumer to consumer: someone makes a copy of a CD for a friend, who makes a second generation copy for another friend, who makes a third generation copy for another friend, and so on.  Hence the "consumer"

immunity for private, noncommercial copying provided for in Section 1008.  17 U.S.C. § 1008.

The "Serial Copy Management System" adopted by Congress to prevent copies being made from

copies, which is the very core of the AHRA, *see* 17 U.S.C. § 1002, makes sense only in this

context.  Indeed, the statute expressly contemplates "devices" (such as a DAT or CD recorder)

that make copies onto physical "media" – not computer networked devices that are themselves

storage media.  *See* 17 U.S.C. § 1001(4) (defining "digital audio recording ***medium***" under the

AHRA); 17 U.S.C. § 1004(b) (providing for a separate royalty payment for "each digital audio

recording medium" distributed in the United States).[2]

The AHRA's legislative history is clear that the AHRA extends to copying to and from

traditional physical media only, and that this limitation is embodied in the Section 1001(5)(A)

definition of "digital musical recording."  *See, e.g.*, H.R. Rep. 102-873(II), at 2 (1992) ("The

purpose of [the AHRA] is to create the necessary legal environment for digital audio tape (DAT)

technology to be introduced into the commercial marketplace in the United States"); S. Rep. 102-

294, at 36 & n.36 ("audiogram," later renamed "digital musical recording," is "intended to cover

those objects commonly understood to embody sound recordings and their underlying works,"

"[t]hat is recorded compact discs, digital audio tapes, audio cassettes, long-playing albums,

digital compact cassettes, and mini-discs"); S. Rep. 102-294, at 46 ("[t]he intention is for the

term [digital musical recording] to cover objects commonly understood to embody sound

recordings and their underlying works, such as recorded compact discs (CD's), digital audio

---

[2]  Although *amici* contend that the AHRA should be broad enough to cover all digital recording
technology, none of the legislative history they cite contradicts the fundamental premise that the
AHRA contemplates copying onto traditional physical media only.  Their "legislative history,"
moreover, consists solely of the testimonial platitudes of private parties during legislative
hearings.  They are not Congressional statements and have no weight.  *E.g.*, *Kelly v. Robinson*,
479 U.S. 36, 51 n.13 (1986) ("none of [these] statements was made by a Member of Congress,
nor were they included in the official Senate and House Reports.  We decline to accord any
significance to these comments.").

tapes (DAT's), audio cassettes and long-playing albums (LP's), and in the near future, digital compact cassettes (DCC's) and mini-discs (MD's)"); H.R. Rep. 102-873(I), at 12 (describing AHRA as extending to "DAT, DCC, Mini-Disc, etc"); H.R. Rep. 102-780(I), at 70 ("digital audio recording medium" refers to material objects "such as magnetic digital audio tape cassettes, optical discs, and magneto-optical discs").[3]  Thus, because recordings copied to the inno cannot be "digital musical recordings" under the AHRA, the inno itself is not a DARD, and Section 1008 simply does not apply.  The Court can decide this issue as a matter of law.

## III.   The Court Cannot, On A Motion To Dismiss, Make The Factual Findings Required To Conclude That The Inno Is A Covered Device Under The AHRA.

Even if the copies made on the inno could in theory meet the basic definition of "digital musical recordings," XM cannot make the factual showing needed to sustain that claim on the pleadings.

### A.   XM Cannot Establish On The Pleadings That The Inno Qualifies As A DARD In Light Of The AHRA's Express Exclusions.

The AHRA definition of "digital musical recording" has two separate aspects: the *basic definition* in Section 1001(5)(A), and the *express exemptions* in Section 1001(5)(B).  Both must be satisfied independently.  *See Diamond Multimedia*, 180 F.3d at 1078.  Thus, even if the inno could satisfy the basic definition in Section 1001(5)(A) – and it cannot, *see* Point II *supra* – there

---

[3]  Even when the statute references copies made "indirectly from a transmission," *see* 17 U.S.C. § 1001(1), it contemplates a traditional physical medium (a CD, for example) being played by a radio station and being copied indirectly via that radio transmission.  S. Rep. 102-294 at 47 ("a digital audio recording made from a commercially released compact disc or audio cassette, *or from a radio broadcast of a commercially released compact disc or audio cassette*, would be a 'digital audio copied recording.'") (emphasis added); *see also Diamond Multimedia*, 180 F.3d at 1080.  It is almost certainly the case that XM's transmissions are not made *from* "digital musical recordings," and thus the inno does not reproduce a "digital musical recording" "indirectly from a transmission."  Discovery would likely establish this as an independent reason why the AHRA does not apply.

21

is no way for this Court to determine based on the pleadings whether the inno is expressly excluded as a result of the exemption in Section 1001(5)(B).

   As mentioned above (pages 17-18, *supra*), Section 1001(5)(B) generally excludes from the definition of "digital musical recording" any material object "in which one or more computer programs are fixed."  17 U.S.C. § 1001(5)(B).  Thus, if the inno contains "computer programs" beyond the limited ones expressly permitted, then recordings copied to the inno are not "digital musical recordings" and the inno cannot be a DARD.  Similarly, if the "object" on which XM stores the sound recordings for purposes of transmitting them to subscribers contains computer programs, the recordings do not qualify as "digital music recordings" and the inno cannot be a DARD because it is not copying a "digital musical recording . . . indirectly from a transmission." 17 U.S.C. § 1001(1); *see also supra* note 3.  This statutory provision excludes from the AHRA any form of computer, or computer hard drive or similar memory.  *See Diamond Multimedia*, 180 F.3d at 1078 (the Section 1001(5)(B) exemption "extends to any copying from a computer hard drive").

   Section 1001(5)(B) requires technical determinations that cannot be made as an evidentiary matter without discovery of XM and expert analysis of the inno.  Although it seems beyond doubt that both XM's source computer and the inno itself contain extensive computer programs that would disqualify them under Section1001(5)(B), the Record Companies cannot confirm this fact with admissible evidence except through discovery.  More to the point, XM cannot possibly meet its burden on this technical issue at the pleading stage, without any evidence at all.  That probably explains why XM ignores Section 1001(5) entirely.

**B.     XM Cannot Show On The Basis Of The Pleadings That The Inno Qualifies As A DARD Under The AHRA's "Primary Purpose" Test.**

To qualify as a DARD, the inno's recording function must be designed or marketed for the "primary purpose" of making "digital audio copied recordings."  17 U.S.C. § 1001(3).  The AHRA expressly excludes "nonmusical sounds" and "spoken word recordings" from the "primary purpose" equation.  17 U.S.C. § 1001(3)(B); *id.* § 1001(5)(B)(i).  The legislative history further explains that "primary purpose" is "a purpose that exceeds 50 percent of all purposes.  *See* S. Rep. 102-294, at 47.  Thus, the "50% +1" purpose of a device's recording function must be to record "digital musical recordings" excluding "nonmusical" or "spoken word" recordings.  XM cannot meet that test on the basis of the pleadings.  Indeed, it is unclear how XM could possibly meet that test on a full evidentiary record.

*First*, by XM's own account, the inno is a half MP3 player, half satellite radio recorder, with the inno's memory partitioned "50-50" between the two uses.  XM Mem., Ex. 3, at 77.  XM refers to the inno as "XM + MP3" and unabashedly promotes it with direct reference to MP3 players.  *See* Compl. ¶ 3 ("It's not a Pod, it's the Mothership," a direct reference to the Apple iPod); inno Box (describing inno as "World's first portable satellite radio + MP3 player"); XM Mem., Ex. 2, at 3 (coining phrase "XMp3 PLAYER").  Because MP3 files are not "digital musical recordings" under the AHRA, the inno cannot meet the AHRA's "primary purpose" threshold.  *See Diamond Multimedia*, 180 F.3d at 1077; *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1024-25 (9th Cir. 2001) (MP3 files are not "digital music recordings" under AHRA).

*Second*, the remaining 50 percent – the XM satellite radio programming – is not exclusively music, and includes "spoken word" content such as news, talk and sports shows.  Compl. ¶ 22 (only 67 of 160 XM channels are devoted to music); XM Mem. at 3 (referencing "channels dedicated to news and public affairs, talk, and sports").  Thus, a full evidentiary record

is certain to show that less than half of the inno's use is in fact intended for copying "digital musical recordings" as required under the AHRA's "primary purpose" standard.

*Finally*, as discussed above, discovery would very likely reveal that even XM's *musical* programming cannot be counted in the "primary purpose" analysis because it is excluded from the AHRA definition of "digital musical recording" through the statutory exemptions in 17 U.S.C. § 1001(5)(B).  Thus, XM cannot meet the "primary purpose" test based on the pleadings.

C.     **The Court Cannot Accept As True The Self-Serving Statements In The XM User And Product Guides.**

XM seeks to paper over the patent deficiencies in its motion by pointing to two extrinsic documents – a User Guide and a Product Guide – and urging this Court to rely on self-serving characterizations in those documents.  *See* XM Mem. at 13-16.  XM's motion would fail even if the Court accepted those statements as proven facts, because neither document provides a basis for either the Section 1001(5)(B) "express exemption" findings or the Section 1001(3) "primary purpose" findings required under the AHRA.  But, this Court cannot even consider those XM documents, much less credit them as conclusively true.

*First*, the Record Companies have not "relie[d] heavily upon [the] *terms and effect*" of the extrinsic documents; the Guides therefore are not "integral" to the complaint.  *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (*per curiam*) (emphasis added); *see also, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-54 (2d Cir. 2002); *AIG Global Securities Lending Corp. v. Banc of Am. Securities LLC*, No. 01 Civ. 11448 (JGK), 2005 WL 2385854, at *13 n.6 (S.D.N.Y. Sept. 26, 2005) (extrinsic document must "form the basis" of plaintiff's allegations).  At best, the complaint "merely discusse[s]" or "present[s] short quotations" from the Guides to illustrate certain allegations – a use the Second Circuit has held does not make extrinsic documents "integral."  *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989).

24

*Second*, the Guides are self-serving documents written by XM with this very litigation in mind. The Court cannot credit XM's own statements on disputed factual issues as dispositively true for purposes of XM's motion. *See e.g., Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 674-75 (2d Cir. 1995). Even on a motion for summary judgment, the XM-prepared Guides would be little more than inadmissible hearsay if proffered as evidence by XM. Here, on a motion to dismiss, the Court is required to accept *Plaintiffs'* allegations as true, not *Defendant's* evidence. XM's motion to dismiss can be denied for this reason alone.

## IV. XM Cannot Contend That The Record Companies' Claims Under Sections 115 And 112 Of The Copyright Act, Or Its State Law Claims, Should Be Dismissed.

Finally, even if Section 1008 did apply in this case (which it does not), XM cannot rely on it to defeat the Record Companies' claims under Sections 115 and 112 of the Copyright Act or under state law. Count II (Compl. ¶¶ 49-56) alleges that XM has engaged in unauthorized digital phonorecord deliveries of the Record Companies' sound recordings in violation of Sections 106 and 115. Section 115 expressly provides that "[n]othing in section 1008 shall be construed" to immunize entities such as XM from claims under Section 115. 17 U.S.C. § 115(c)(3)(I). Thus, XM's immunity defense cannot possibly bar these claims. Similarly, Count IV alleges infringement arising from XM's violation of the 17 U.S.C. § 112(e) statutory license governing "ephemeral recordings" on XM's own computer servers. XM does not even argue that this claim is precluded by the AHRA – and it is not. Finally, XM contends that the Court should exercise its discretion to dismiss the Record Companies' state law claims for pre-1972 sound recordings. But the premise for XM's argument – that Section 1008 bars all federal claims – is wrong, and there is thus no basis to dismiss the state law claims.

## CONCLUSION

The motion to dismiss should be denied.

Dated:   August 31, 2006

JENNER & BLOCK LLP

By:   /s/ Donald B. Verrilli, Jr.     

Donald B. Verrilli, Jr. (DV 5260)
Steven B. Fabrizio (SF 8639)
Michael B. DeSanctis (MD 5737)
Scott B. Wilkens
Ginger D. Anders
Luke C. Platzer

601 Thirteenth Street, N.W.
Suite 1200 South
Washington, DC  20005-3823
tel. (202) 639-6000
fax (202) 639-6066

RECORDING INDUSTRY
    ASSOCIATION OF AMERICA
Steven M. Marks
Kenneth L. Doroshow
Karyn A. Temple

1330 Connecticut Avenue, N.W.
Suite 300
Washington, DC  20036
tel. (202) 857-9637
fax (202) 775-7253